### J. W. BAILEY v. H. F. LONG.

#### (Filed 22 December, 1917.)

**Negligence—Physicians—Hospitals—Evidence—Trials—Questions for Jury.**

In an action by the husband to recover damages for the death of his wife alleged to have been caused by the negligence of defendant in failing to provide a suitable room for her while under treatment at his hospital, there was evidence tending to show that her health was good when she was taken there, except for injuries received in an automobile accident, and that on two or more occasions during a severe rainstorm the rain beat in through an improperly constructed window so that it stood upon the floor of the room, from which it was soon removed, and that a cold to the patient at once resulted, followed by pneumonia, from which she died: *Held,* under this and the other evidence in the case, it was proper to submit the issue of defendant's actionable negligence to the jury.

ALLEN, J., dissenting.

ACTION, tried before *Justice, J.,* at October Term, 1917, of BURKE.

*Avery & Avery, R. L. Huffman, A. C. Avery, and D. L. Russell for plaintiff.*

*W. D. Turner, S. J. Ervin, Z. V. Long, and J. F. Spainhour for defendant.*

PER CURIAM: This action was brought by the plaintiff to recover damages for (1) loss of the services of his wife, (2) loss of her society, and (3) mental anguish on account of her death, which is alleged to have been caused by the defendant's negligence. At the close of the plaintiff's evidence, the defendant, who introduced none, moved for a nonsuit, which was granted, and plaintiff appealed.

The only question in the case is whether there was any evidence of negligence, the weight and sufficiency of it being for the jury to consider. While the evidence may not be of a very strong or conclusive nature, we cannot say upon a perusal of it that there was literally no evidence which should have been submitted to the jury. The allegation of the plaintiff is that his wife, who was suffering with a broken hip, for her better treatment by a most competent and skillful surgeon, was taken by him to Statesville on 18 August, 1913, and placed in the hospital of defendant, who contracted to treat her in a careful and skillful manner, as a physician and surgeon, and to furnish her with a suitable room during her stay therein. There is no complaint at all of the surgical treatment, but plaintiff alleges that when the dislocation of the hip had almost healed, under the defendant's skillful treatment, and when she was otherwise in good health, and about to be discharged from the hospital, his wife's room, by reason of a defect in the construction of

the window sash, was covered with water from a rain, and on account of her exposure to the dampness of the room caused thereby, she contracted a severe cold, which increased in severity, until it developed into pneumonia, which finally caused her death. The evidence tended to show that the deceased was a strong and healthy woman, and had no cough and no trouble with her throat until she caught cold just after the rain. The water was an inch or an inch and a half deep in one corner of the room near her bed, and if the floor had been level it would have been the same depth all over. It required some time to remove it, and the floor was damp afterwards. After plaintiff had bored holes in the outside sash, and let out the water between the sashes, he was asked to fix the window in another room in the same condition, which he did.

The plaintiff testified as to the condition of the window: "Right soon there came a nurse; I don't know who it was; I said, 'Here, stop here a minute; look here at this water.' I suppose it was Dr. Long's nurse; she had on a cap and was dressed like all the rest. I wasn't very well acquainted with them. She turned right back, as quick as she could, and brought Miss Davidson, the head nurse, and two buckets and two cloths or something and went to wiping up the water and wringing it out in those buckets. They kept at that, just as busy as they could be. It was still raining. I said, 'Miss Davidson, it looks like you are not getting it out any faster than it's coming in.' She said, 'It doesn't look so. I must see a carpenter tomorrow and get that fixed.' I said, 'I have to leave here on No. 35, and I'd like to see that fixed before I leave.' I said, 'I'm a carpenter; how about my examining it and see if I can find the trouble?' She said, 'Go ahead.' I raised the window and the rain came blowing right through. I found a deep puddle on the window. I have a model of that window (model is produced. Witness explains model to the jury.) It was a double window. The water was running over the inside of the window. The sash had been pieced; the front piece had been pieced; it seemed the sash had been made too short. I told Miss Davidson if they would get me some tools I thought I could fix it. She came with a box of tools and I looked for a chisel and couldn't find it, and I took a large screw-driver and hammer and drove it up here (indicating on model) and tried to move it, to make a leak, and couldn't do it; it was very tight. I picked up a brace and bit and bored two holes, and the water ran out. I let the sash down, and there wasn't any more trouble. They wiped the floor up until it was as dry as they could get it with a cloth. Miss Davidson was gone out about ten minutes and she said, 'I wish you would come and fix another in one of the rooms.' I took the bit and fixed the other; I couldn't tell you the number of that room; it might have been the second room from where my wife was." He stated that the rain occurred on 10 September, 1913.

He then testified: "I went back on Sunday, the 14th, and she had a very deep cold and cough—bad cough; I think that was the 14th—it was Sunday. The room was dry on that occasion; it was a nice sunshiny day. I guess I must have went back the next Wednesday, far as I know. She had a very bad cold then. I went over and met the doctor near his office door and talked to him. I said, 'My wife's hip is doing nicely.' He said, 'Yes.' I said, 'She has a very deep cold and a mighty bad cough.' I said, 'I come over here to see if you wouldn't give her something for her cough; it hurts her hip so bad when she coughs.' She said to tell Dr. Long so, and I did tell him. I didn't tell him anything she said about how she contracted the cold. He looked at me straight a little bit and said, 'Never you mind, Mr. Bailey, we'll give her the attention she needs without your looking after it at all.' He opened the door and went in the office and shut the door, and I went back to her bed. He said, 'I don't believe in medicine anyway.'"

This witness further stated that they returned to his home on 25 September, 1913. That her cough continued and her physical condition was bad, until he called in a physician, Dr. Flowers, on Monday, 16 November, 1913, who examined his wife, and witness then further testified: "The doctor said, 'How long have you been this way?' Answer, She had been that way ever since 10 September, 1913. Dr. Flowers treated her Monday, Wednesday, and Friday, and on Saturday she died, the 15th of November. The doctor went there on Monday before the 15th. The 15th was Saturday; I recollect that part. The doctor was called in on Monday before Saturday, and he was there on Wednesday and on Friday; three trips is all he made. From the time I took my wife home on the 25th of September until her death on the 15th of November, she was coughing all the time, snuffing and working with her nose; spitting up phlegm; she didn't sleep good; slept maybe an hour or two and would wake up coughing. I waited on her at night altogether, and she suffered. She showed her suffering by coughing, spitting, and complaining of her breast hurting her; never complained of her breast until about a week before Dr. Flowers was there. . . . After my wife got home she never complained of her breast until somewhere near a week before she died. I don't remember exactly. I didn't say she didn't complain of her chest until about the time I sent for Dr. Flowers; she had it before that, something in the neighborhood of a week; might have been five or six days, before the doctor came; up to that time she had a cough, but had no pain in her chest. She hadn't always had that cough. She didn't have trouble with her throat; she was never sick a day in the whole four years we lived together; she never had a catarrh of the throat; stood a good examination for insurance. . . . I did everything for my wife's cold after she came back

that I knew to do; gave her teas and other things; she would cough and snuffle and sometimes take her finger and pull plegm out of her mouth; get it out with her handkerchief; she did that from the time she came back from the hospital until she died; she was that way when I went after her. When she got so much weaker I went after Dr. Flowers; I saw that she was staying one way all the time; she told me she was worse in the morning; Dr. Flowers was from Granite Falls; the nearest doctor I could get."

Susie Parker, one of the nurses, testified: "I live in Statesville, and I worked in Dr. Long's hospital during the time Mr. J. W. Bailey's wife was there; all the time she was there; she was in room No. 14; I don't know how many occasions I have seen water in there, but one time an awful hard rain came and blew in pretty heavy; I don't know what date that was; Mrs. Bailey was there then; nobody else was in that room; I took the water off of the floor; think I took about a slop bucket and a half of water out of that room; the water kind of run to the side of Mrs. Bailey's bed; don't think it was under the bed; the water came from the window; it was raining when I was in there; that was Saturday evening late; I went in there again when there was water in the room, about the same place, kind of a swag in the floor; I didn't take up but about a half bucketful then; it was kind of under the bed, standing under the bed; it had come from the window; I was there again when there came a hard rain from the north, and it came in; none of the nurses were in there when I was in there, but Miss Davidson saw it; had a hard storm; that wasn't the evening Mr. Bailey was there; Miss Davidson saw it the first evening; I didn't say anything to her about it. She saw it. I saw Mr. Bailey at the time he was there. I noticed what kind of a sash that was; it was like that model; a screen on the back. I saw holes bored in the screen; two holes. I saw something like that in No. 11. . . . I left Dr. Long's hospital on the 15th of September, 1913, I reckon. This is 1916. I saw water on that floor while Mrs. Bailey was there; I don't know how many times; I think about twice; that was along about the first of the month, I think; the first of September; that was during a heavy rainstorm; the wind was blowing; while the rain was still falling and the wind still blowing, they wiped it up; it stayed on the floor until we could get it up; don't know how many minutes; that happened twice; that was all while Mrs. Bailey was there." The witness further testified:

"Mr. Bailey said he wanted to know what I knew about the water being on the floor; he said Mrs. Bailey contracted a cold, he thought, from the water being on the floor."

Q. Did he tell how he knew she contracted a cold from the water being on the floor?

Defendant objects.

Q. Tell exactly what he said. A. "I don't know exactly. He said he wanted to know when I had seen water on the floor; he told me how he happened to ask me about it. She had told him. . . .

"I went up to Mr. Bailey's house; he asked me to come up there. When I got there I found he wanted to know something concerning the water; wanted to see what I would testify; he had a lawyer there, Mr. Russell was there; took down my testimony. I saw water in that room several times before Mrs. Bailey was there, but not so much; I just took it up at those times; I would just go and take it up; nobody would tell me to do it; I would just be cleaning up the room; I cleaned up the rooms there and carried trays."

Annie Kistler testified: "I live at Hildebrand. I knew Mrs. Bailey; I knew she was the wife of Mr. J. W. Bailey; I was called in to wait on her after she came from Dr. Long's hospital; I remember the time she came back; they came on the train and I went to see her that evening; she was coughing and had a very bad cold, and the next morning I went back, and then I never went back until the next day or two, and I went back to see her and asked her how she was getting on, and she said she wasn't feeling any better; she said she had a cough and said 'It hurts me to cough.' I didn't stay with her then; I went home and in a few days or a week, I don't remember which, he sent for me to come; said his wife was no better and he wanted me to cook, and I went and stayed two weeks, and I saw every day his wife was sinking and I went home. She had a cough and bad cold and cried and hollered, and her nose was running all the time, and she was throwing phlegm out of her mouth. I don't know when Dr. Flowers was called; I went home; I didn't go back; I can't tell you how long it was after I left until she died; I never paid any attention after that; I know it wasn't very long after I left until she died. I sat up with her sometimes until 11 o'clock; after I would get through my work I did so. Her husband took care of her."

There was evidence which tended to disparage some of the plaintiff's witnesses and to attack their testimony, but it is not necessary to state it as the plaintiff is entitled to the most favorable construction of the evidence and, upon a motion to nonsuit, we need only consider that part of the evidence which tends to sustain his cause of action, and not that which tends to disprove it. There was no expert medical testimony.

It would not be proper to comment on the evidence, or to say more than is necessary to decide the question whether there is any evidence which is relevant and tends to support the allegations in the complaint, as there is no contention as to their sufficiency to constitute a cause of action, if they are true. It was necessarily decided in the former appeal that plaintiff could recover if he established his case by competent

BAILEY v. LONG.

testimony, as the defendant demurred to the complaint and his demurrer was overruled.

It is said in 13 Cyc., 216: "Evidence of good health prior to the injury, and of suffering or ailments immediately or shortly thereafter, which are shown by competent testimony to be reasonably imputed to it and are not shown by expert testimony to be an impossible effect of the injury is sufficient to carry the question to the jury."

And in *Stephenson v. Flagg,* 41 Neb., at p. 373, the Court said: "There was abundant evidence to sustain the verdict of the jury, first, as to the good health of Mrs. Flagg before 7 April, 1887, and, second, as to the change in her health following upon the injury, and that it was of such nature as to be reasonably imputed to it. There was detailed in evidence the history of her case, showing the gradual development of new and unfavorable symptoms until we reached the results described on the trial." See, also, *Quackenbush v. R. R.,* 73 Iowa, 458; *Berard v. R. R.,* 177 Mass., 179; *Stein v. Kosler,* 67 N. J. L., 481; *Denver v. Hyatt,* 28 Col., 129.

The question as to whether the injuries to plaintiff's wife, and her death, were caused by the water which entered her room during the storm should have been submitted to the jury under proper instructions from the court, and it was error to dismiss the action for a failure of evidence.

New trial.

ALLEN, J., dissenting: I do not think there is any evidence of negligence, or that the conduct of the defendant caused the death of the plaintiff's wife, and the evidence of damage is slight.

The wife of the plaintiff was injured in an automobile accident, and was carried to the hospital of the defendant for treatment on 18 August, 1913; she remained in the hospital until 25th September, when she returned to her husband's home, where she remained until her death on 15th November.

It is admitted that she was skillfully treated while in the hospital of the defendant, and the only evidence of negligence is that on two occasions during a heavy rain water beat through the window onto the floor of the room where she was. The first of these occasions was about the 1st of September, and the plaintiff's witness describes this as follows: "It was during a heavy rainstorm; the wind was blowing; while the rain was still falling and the wind still blowing they wiped it up; it stayed on the floor until we could get it up; don't know how many minutes"; and the second by the plaintiff, who says: "That was a heavy rain that day; blew in the window; it wasn't no hard storm; the wind was coming from the northeast; came right against that window."

This is an experience common to all householders, and which cannot be averted by the exercise of the greatest care. If, however, there is evidence of negligence, it is purely conjectural that this negligence had anything to do with the death of the plaintiff's wife.

The first rain, occurring about the 1st of September, did not injure her because the plaintiff testifies that the second rain occurred on the 10th of September, and that he went back to see his wife on the 14th of September, and he says "she was looking all right up until that time that I went there; she wasn't doing so well that day."

According to the evidence of both witnesses who testified as to the water on the floor, the water did not reach the bed on which his wife was and it only remained upon the floor a few minutes.

The plaintiff testifies that after she went back home she was sometimes better and sometimes worse; that she did not complain of any pain in her chest until about a week before she died, and that he did not call a physician to her until Monday before her death, and this physician was not introduced as a witness.

Under these circumstances a jury could do no more than guess as to what caused the death of the plaintiff's wife. I cannot say that there is no evidence of damage, but it is slight.

The plaintiff testifies: "She was a stout, handy woman; did her washing, her own ironing, kept up all her place, worked her garden, tended to the office some, sold the machines when I'd be away; she did the cooking and housekeeping." This furnishes evidence that the wife was an industrious woman, who did much to maintain the plaintiff, but he is not suing to recover damages for the wrongful death for the reason that he waited more than a year before the commencement of this action, and he seeks to recover only for the loss of the services and the society of his wife.

It appears, however, that the wife who died was his second wife, and that he married her two months after his first wife died. It also appears that he married a third wife four and one-half months after the death of his second wife, and surely her society and services are a full compensation for the loss of the services and society of his second wife.